**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **WELLS FARGO BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05 C 5635** |
| | ) | |
| **PAUL SIEGEL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

SAMUEL DER-YEGHIAYAN, District Judge

Plaintiff Wells Fargo Bank, N.A. ("Wells") brought the instant action against

Defendant Paul Siegel ("Siegel") and included in its complaint a breach of contract

claim based on an alleged breach of the Farmer Marketing Program provided by Ty-

Walk Liquid Sales, Inc. ("Ty-Walk") (Count I), a breach of contract claim based upon

the alleged failure to pay for additional goods and services provided by Ty-Walk

(Count II), and a breach of contract claim based upon the alleged failure to repay a

loan payment made by Ty-Walk on behalf of Siegel. (Count III).

On September 6, 2006, Wells moved for summary judgment in this case on all

claims and on October 19, 2006, we denied Wells' motion for summary judgment on

Count I, granted Wells' motion for summary judgment on Count II, and denied Wells'

motion for summary judgment on Count III.  A bench trial was conducted in this case as to Counts I and III from April 23, 2007, through April 26, 2007.  We have reviewed all admissible evidence in this case and enter the following findings:

## FINDINGS OF FACT

I.  Jurisdiction

Wells is a national banking association with its principal place of business located in the state of California and its bank's organization certificate lists South Dakota as the state where Wells carries on its operations.  Siegel is a citizen of the state of Illinois.  In the complaint, Wells sought $380,525 on Count I, $20,678.47 on Count II, and $50,785 on Count III.

II.  Breach of Contract Claim Based upon Farmer Marketing Program (Count I)

A.  Parties

1.  Siegel is a farmer and has been a farmer since the 1970s.  (Tr. 146).

2.  Ty-Walk was a grain merchant that marketed grain for farmers.  (Tr. 37).

3.  Wells is a national banking association and Ty-Walk pledged its accounts receivable, other rights to payment, contract rights, and the proceeds stemming from those rights to Wells as security for loans that Wells extended to Ty-Walk under a loan agreement ("Loan Agreement").

B.  Standing of Wells

4.     Ty-Walk ceased doing business in August 2001, and in June 2003, the Circuit Court of the Sixteenth Judicial Circuit, Kendall County, Illinois, entered an order, which granted Wells possession of the collateral of the Loan Agreement.

5.     Wells brought the instant action to enforce the contractual rights of Ty-Walk that were assigned to Wells as part of the Loan Agreement.  The parties stipulated that for the purposes of this action, Wells stood in the place of Ty-Walk.

C.  Ty-Walk's Operations

6.     Ty-Walk had an office in Minooka, Illinois and then transferred its office to Elwood, Illinois sometime around 1997 when it merged with another company. (Tr. 42).

7.     Ty-Walk conducted meetings and discussion groups with farmers that related to grain marketing techniques.  (Tr. 158-59).

8.     Ty-Walk operated a program called the Farmer Marketing Program ("FMP"). (Tr. 38).

9.     The intended general purpose of the FMP was to assist farmers in marketing their grain.  (Tr. 38).

10.     The FMP program was run by John C. "Buzz" Gibbons ("Gibbons"), the CEO for Ty-Walk, and Sherrie Martin ("Martin").  (Tr. 45-46).

11.      Ty-Walk was operated in an informal and casual manner.  Siegel, for example,

was not required to sign a written contract to join the FMP and no definitive terms were set out in writing when he joined. (Tr. 164, 318). Gibbons also performed trades for Siegel based upon oral conversations without any written exchange or up-front documentation on the part of Ty-Walk. (Tr. 164).

Gibbons made informal sales pitches to farmers regarding the FMP at breakfast meetings, annual dinners and barbeques and would sometimes casually meet with farmers to discuss marketing matters. (Tr. 160-61). Ty-Walk's actions in regards to the FMP participants' grain were often based upon informal contacts with Gibbons or other Ty-Walk staff without written agreements or defined terms. (Tr. 158-60, 164-65). For instance, rather than an up-front agreement as to the marketing strategy, Gibbons would make marketing decisions on his own and the participants would only learn about the strategies "after the fact" by contacting Ty-Walk employees such as Cindy McDonald ("McDonald") and asking her to explain the strategy or actions chosen by Gibbons. (Tr. 45-46). Gibbons controlled the trades at Ty-Walk and not even the official customer contact representatives at Ty-Walk were made privy to Gibbons' dealings with the customers' grain. (Tr. 45, 106). In addition, McDonald stated that Gibbons would tell her to place calls for trades and McDonald, who also entered some of the data to document the trades for customers, generally had no idea whether the customer actually authorized the trade. (Tr. 48, 103).

12. Siegel began marketing his grain through James Tyler & Sons ("Tyler") and

switched his grain transactions to Ty-Walk due to the fact that Ty-Walk charged a lower commission. (Tr. 158, 164).

13. McDonald was an employee of Ty-Walk that became involved in the operation of the FMP around 1994 or 1995. (Tr. 38).

14. McDonald testified that it was her general understanding that the FMP involved the trading of options and futures on the Board of Trade. (Tr. 39). However, McDonald was unable to confirm whether Siegel's participation in the FMP involved such trading or whether Siegel was aware of such trading. (Tr. 101-103). McDonald also testified that when Gibbons told her to call a broker for a trade, "unless someone specifically talked to" her, she had no way of knowing whether the FMP participant had authorized the trade. (Tr. 103). McDonald, in fact, testified that she has never spoken personally with Siegel, that she was not a contact for Siegel's account, and that she did not know if Siegel authorized certain trades on his account. (Tr. 103-04).

15. McDonald was not actually involved in the actual trading of grain. She was merely a "customer service person," and was a "go-between" that relayed messages to Gibbons, who handled all the trading decisions. (Tr. 44-45).

16. McDonald was shown paper records at trial that bore the name of Siegel and McDonald was able to testify as to the general procedures and software that likely produced the records, but McDonald was unable to testify as to specific recollections regarding the creation of any of the exhibits pertaining to Siegel's account or any trades involved in Siegel's account. (Tr. 47-50, 79, 100-01).

17. Barbara St. Germaine ("St. Germaine") worked for Ty-Walk and at some point was instructed to assist McDonald with the FMP. (Tr. 112-113).

18. St. Germaine was shown some of Ty-Walk's records on the witness stand that pertained to 2000 and 2001 and St. Germaine acknowledged that the records were created in 2000, when she was not assigned to the FMP, and in 2001, after her employment ended at Ty-Walk. (Tr. 127, 129). St. Germaine could not confirm whether she personally had been involved in mailing out the statements for Siegel's account. (Tr. 127-28).

19. St. Germaine testified that she was never contacted personally by Siegel, that she was never assigned to Siegel's account, and that she did not have personal knowledge regarding Siegel's account. (Tr. 131).

20. It was the customary practice at Ty-Walk to create paper records ("Trade Records") to document trades in a Ty-Walk customer's account. (Tr. 46, 116-17). The Trade Records were customarily created in triplicate. The top copy was signed by a Ty-Walk employee and the signature was imprinted on the two copies. The top copy was kept by Ty-Walk and the two copies were mailed to the customer. The customer was then expected to sign one of the two copies and return it to Ty-Walk. (Tr. 54-57, 76-77, 116-18).

21. McDonald testified that it was her understanding that the Trade Records were not intended to be a contract, but rather were merely "confirmations of a trade," that were "generated after the transaction occurr[ed]." (Tr. 58, 76, 81-82). McDonald could not recall whether the Trade Records were mailed to the

customer.  (Tr. 58-59).

22.  Ty-Walk also sent its customers monthly statements of their accounts
("Monthly Statements").  (Tr. 85).

23.  The individuals at Ty-Walk in charge of operating the FMP were Gibbons and
Martin.  (Tr. 45-46).

24.  The Ty-Walk representatives with whom Siegel discussed the Ty-Walk grain
marketing program were Gibbons and Martin. (Tr. 196, 482, 516-17).


D.  Offer Regarding Participation in FMP

25.  The offer proposed by Gibbons on behalf of Ty-Walk to Siegel regarding the
FMP was that Siegel would sell and deliver grain to Ty-Walk and Ty-Walk
would pay Siegel for the grain.  (Tr. 482-83, 516-17).

26.  Gibbons and Siegel understood that the part-payment Siegel would receive
from Ty-Walk for his grain would be either a spot price or a future price.  (Tr.
483).

27.  Gibbons and Siegel understood that there would be a service fee of "a penny or
two per bushel" when Siegel participated in the FMP.  (Tr. 169).

28.  Gibbons discussed with Siegel potential strategies for marketing grain and the
fundamentals of the market and how to determine a good time to sell his crops,
but Siegel never agreed to trading that would involve a loss and never had
reason to conclude based upon the circumstances that the trading would
involve a loss.  (Tr. 161, 173).

29.   Although Siegel understood that there was a possible "prospect" that Ty-Walk could trade futures or options with his account, Siegel never understood that, as part of the FMP, Ty-Walk was going to perform futures trading or options trading on behalf of Siegel and Siegel had no reason to conclude based upon the circumstances that Ty-Walk was going to perform such trading.  (Tr. 169, 173, 318).


E.  Acceptance of Offer for Participation in FMP

30.   Siegel agreed to market his grain through the FMP.  (Tr. 172, 516).

31.   Siegel and Gibbons orally agreed that Siegel would participate in the FMP, but there is no written agreement commemorating that oral agreement.  (Tr. 164).

32.   Siegel's acceptance was to the perceived terms that entailed the selling and marketing of his grain through Ty-Walk on either a spot price or a future price.  (Tr. 483).

33.   Siegel understood that the purpose of marketing his grain through Ty-Walk was to limit his risk of loss and to get a better price for his grain than if he sold it on his own.  (Tr. 518).

34.   Siegel elected to market his grain through Ty-Walk because the commission per bushel was less at Ty-Walk than it was at Tyler.  (Tr. 164).

35.   No written document was created to commemorate Siegel's entrance into the FMP or any contractual obligations associated with such membership.  (Tr. 164, 165, 169).

<u>F.  Terms Not Part of Acceptance</u>

36.    Although Siegel understood that as a participant there was the possibility that Ty-Walk was capable of performing futures trading on his account, Siegel did not understand that his account would be used for such activity and, in particular, did not understand that his account would be involved in any trading that could involve a loss.  (Tr. 172-174).

37.    Siegel never entered into a written agreement authorizing Ty-Walk to perform futures trading on his behalf.  (Tr. 318).

38.    Siegel never gave Ty-Walk permission in writing to perform futures trading on his behalf.  (Tr. 318).

39.    Siegel never entered into a written agreement authorizing Ty-Walk to perform options trading on his behalf.  (Tr. 318).

40.    Siegel never gave Ty-Walk permission in writing to perform options trading on his behalf.  (Tr. 318).

41.    In the 1995 to 1996 time frame, Siegel never entered into an oral agreement authorizing Ty-Walk to perform futures trading on his behalf.  (Tr. 319).

42.    In the 1995 to 1996 time frame, Siegel never gave Ty-Walk verbal permission to perform futures trading on his behalf.  (Tr. 319).

43.    Siegel never entered into an oral agreement authorizing Ty-Walk to perform options trading on his behalf.  (Tr. 319).

44.    In the mid-1990s time frame, Siegel never gave Ty-Walk verbal permission to

perform options trading on his behalf.  (Tr. 319).

45.  Siegel never agreed, verbally or in writing, to allow Ty-Walk to trade futures on his behalf.  (Tr. 165).

46.  Siegel never authorized anyone at Advance Trading to perform trades on his behalf from 1996 to 2001.  (Tr. 474).

47.  Siegel never authorized anyone at Advance Trading to perform trades through Ty-Walk in his name from 1996 to 2001.  (Tr. 474).

48.  Siegel never authorized any rollovers of trades from 1996 to 2001 at Advance Trading.  (Tr. 474).


G.  Trading Records Mailed to Siegel

49.  Ty-Walk sent the Trade Records to Siegel purporting to confirm trades in regards to certain types of contracts.  (Tr. 46, 116-17, 132, 179, 191).  Siegel generally signed the records, as ordered by Ty-Walk's "instruction," and mailed one copy back to Ty-Walk.  (Tr. 191-94).  Siegel signed the documents because he was instructed to do so, not because he intended to memorialize a pre-existing contract.  (Tr. 191-94).  Siegel, however, did not fully understand the Trade Records and, in fact, noted in handwriting on some that he had signed that he did not understand certain notations and that he believed some were inaccurate.  (Tr. 195, 201, 520-22).  Siegel made written statements on the Trade Records such as that he believed he had a "zero balance" and that he did not "owe any money" and that he wondered why he received such a statement.

(Tr. 520-21).

50. Siegel never received a call from anyone at Ty-Walk to discuss his questions or comments made on the Trade Records that he returned to Ty-Walk. (Tr. 346-48).

51. Based upon the Ty-Walk documents presented by Wells at trial, there were at least ten (10) trades on Siegel's account, each requiring delivery of 35,000 bushels of #2 corn by Siegel for the 1999 crop year. (P Trial Exhibit WFX-10, pp. PS000466, PS000441, PS000443, PS000445, PS000447; Plaintiff's Trial Exhibit WFX-11, p. FBI010016; Plaintiff's Trial Exhibit WFX-12, pp. PS000449, PS000451, PS000453, PS000455 and Tr. 328-34).

52. The ten trades cited required delivery of 350,000 bushels of #2 corn for the 1999 crop year. (Tr. 334-35).

53. Siegel would not have been able to deliver 350,000 bushels of #2 corn for the 1999 crop year or even 300,000 bushels of #2 corn for the 1999 crop year, because his maximum delivery would have been 90,000 bushels of #2 corn for the 1999 crop year. (Tr. 335).


H. Audits of Siegel's Account

54. Siegel received the document entered into evidence as Defendant's Trial Exhibit SX-1 by mail on or before August 19, 1998 ("Audit #1"). (D Trial Exhibit SX-1, p. CG003860 and Tr. 490-91).

55. Siegel was confused about Audit #1 and the numbers on the document. (Tr.

491).

56. In response to the request that he inform Ty-Walk's auditors, Clifton
    Gunderson LLP, whether the balance was in agreement with his records, Siegel
    selected the option on Audit #1 that the balances shown were not correct. (D
    Trial Exhibit SX-1, p. CG003860 and Tr. 491-92).

57. Siegel received the document entered into evidence as Defendant's Trial
    Exhibit SX-2 by mail on or before September 2, 1999 ("Audit #2"). (D Trial
    Exhibit SX-2, p. CG007560 and Tr. 492-93).

58. Siegel handwrote on Audit #2 that, "These are not cash debt but Grain to be
    delivered. PS." (D Trial Exhibit SX-2, p. CG007560 and Tr. 493-94).

59. In response to the request that he inform Ty-Walk's auditors, Clifton
    Gunderson LLP, whether the balance was in agreement with his records, Siegel
    selected the option on Audit #2 that the balances shown were not correct. (D
    Trial Exhibit SX-2, p. CG007560 and Tr. 494).

60. Siegel mailed Audit #2 with his indication back to Clifton Gunderson LLP.
    (Tr. 495).

61. Siegel received one copy of the document identical in form to the document
    entered into evidence as Defendant's Trial Exhibit SX-3 by mail in early
    September 2000, approximately one month prior to receiving the second copy
    of the same document ("Audit #3"). (D Trial Exhibit SX-3, p. CG000501 and
    Tr. 495-96).

62. On the first copy of Audit #3, Siegel signed it and indicated that the balances

shown were not correct.  (Tr. 496-97).

63. Siegel did not understand the numbers on the first copy of Audit #3 and therefore did not agree with the numbers.  (Tr. 497-98).

64. Siegel wrote on the first copy of Audit #3 that he was confused and did not agree with the numbers.  (Tr. 498).

65. Siegel mailed the first copy of Audit #3 with his indication back to Clifton Gunderson LLP.  (Tr. 497).

66. After Siegel sent the first copy of Audit #3 to Clifton Gunderson LLP and before he received Defendant's Trial Exhibit SX-3, he received a phone call from Gibbons.  (Tr. 499-500).

67. Siegel believed that he had checked the first copy of Audit #3 correctly.  (Tr. 502).

68. Siegel received the document entered into evidence as Defendant's Trial Exhibit SX-3 by mail on or before October 3, 2000 ("Audit #3").  (D Trial Exhibit SX-3, p. CG000501 and Tr. 496).

69. Siegel signed the second copy of Audit #3 and placed a check next to the box that states, "The balances shown above are correct," because Gibbons told him to do so.  (D Trial Exhibit SX-3, p. CG000501 and Tr. 502-03).

70. Siegel added after the checked line on the second copy of Audit #3 in his own handwriting, "Per Phone Call with Buzz 9/28/00 and its clarifications. PS."  (D Trial Exhibit SX-3, p. CG000501 and Tr. 503).

71. Siegel felt it was not proper for him to indicate that the balances shown in

Audit #3 were correct because he had previously accurately indicated that it was not correct. (Tr. 505-06).

72. Siegel felt it would have been more proper for him to check the second line on the second copy of Audit #3 and more in accordance with his understanding of the document. (Tr. 506).

73. When viewing Audits #1-3, Siegel always believed that his account balance with Ty-Walk was zero. (Tr. 520).

74. Siegel thought his account balance with Ty-Walk was zero because he was selling grain and very seldom would more than a few days pass between delivery of the grain and when he got paid for the grain. Siegel reasonably believed that his account would always balance out and he would not owe Ty-Walk anything. (Tr. 483-84).


III. Breach of Loan Agreement (Count III)

75. The Commodity Credit Corporation ("CCC") is part of the U.S. Department of Agriculture and gives loans to farmers using commodities as collateral. (Tr. 260).

76. In 2000, Siegel obtained a loan through the CCC ("2000 CCC Loan"). (Tr. 260).

77. As part of the 2000 CCC Loan, Siegel delivered corn to Ty-Walk. (Tr. 264).

78. As part of the 2000 CCC Loan, Ty-Walk gave Siegel one or more warehouse receipts for the delivered corn. (Tr. 264-65).

79. Siegel took the warehouse receipt(s) in 2000 to the CCC. (Tr. 265).

80. The amount of the 2000 CCC Loan, according to Siegel, was in the range of $60,000-$70,000. (Tr. 265).

81. Siegel signed loan documents with the CCC that show the terms of the loan. (Tr. 265).

82. The corn Siegel delivered to Ty-Walk in 2000 was the collateral for the 2000 CCC Loan. (Tr. 265).

83. A farmer can repay a CCC loan by: (1) repayment of the amount of the loan plus interest, (2) allowing the CCC to keep the grain that was pledged as collateral, or (3) accepting the county price for the grain as determined by the CCC. (Tr. 266-68).

84. All three repayment methods result in a CCC loan being extinguished. (Tr. 267-68).

85. When a CCC loan is based on a warehouse receipt, by CCC's regulation the warehousing company must pay off the loan or accept the county-posted price. (Tr. 272).

86. Generally once a CCC loan is repaid, the grain is released. (Tr. 273).

87. Ty-Walk paid $50,785.16 by check number 2368 to the CCC. (P Trial Exhibit WFX-23 and Tr. 230).

88. Ty-Walk paid this amount to the CCC on behalf of Siegel. (Tr. 231).

89. Ty-Walk paid off the 2000 CCC loan. (Tr. 229)

90. Ty-Walk's repayment of the 2000 CCC Loan was the normal procedure for a

CCC loan and the only way it could be repaid. (Tr. 273).

91. The amount of the payoff less than Siegel's loan with CCC. (Tr. 231).

92. The payoff amount was determined by the CCC. (Tr. 231).

93. The payoff amount was based on the daily county-posted price option and Ty-Walk decided to pay off the loan because Ty-Walk speculated that the price was as low as it was probably going to go. (Tr. 274).

94. The Ty-Walk check paying off the 2000 CCC Loan represented the payoff of the entire loan at the county-posted price. (Tr. 275).

95. Once Ty-Walk paid off the 2000 CCC Loan, the loan was extinguished and the grain was free and clear. (Tr. 275-77).

96. Ty-Walk received the warehouse receipts back from the CCC after the 2000 loan was repaid. (Tr. 281).

97. Siegel never received the warehouse receipts back from Ty-Walk. (Tr. 281-82).

98. Ty-Walk advanced the $50,785.16 to Siegel toward the sale of grain being warehoused for Siegel at Ty-Walk's facility. (Tr. 275).

99. Siegel did not pay back the $50,785.16 amount advanced by Ty-Walk. (Tr. 231).

100. Siegel did not sell the grain warehoused at Ty-Walk for the 2000 CCC Loan. (Tr. 279).

101. Ty-Walk did not return the grain Siegel warehoused for the 2000 CCC Loan. (Tr. 280).

102.    When Ty-Walk closed for business on August 23, 2001, Ty-Walk was still in possession of the grain Siegel warehoused for the 2000 CCC Loan.  (Tr. 280).

103.    To the present day, Siegel has not received the grain from Ty-Walk warehoused for the 2000 CCC Loan.  (Tr. 280).

104.    To the present day, Siegel did not sell the grain warehoused at Ty-Walk for the 2000 CCC Loan.  (Tr. 280).

105.    The value of Siegel's grain still in Ty-Walk's possession as of September 2000 was much larger than the $50,785.16 amount that Ty-Walk paid to CCC to extinguish the 2000 CCC Loan.  (Tr. 279).


## IV.  Witness Credibility

Siegel testified at trial and based upon his demeanor on the stand and his forthright responses it was clear that his testimony was entirely credible.  In particular, Siegel's statements that, based upon his discussions with Gibbons, he did not realize that Gibbons was going to trade futures or options on his behalf and that Siegel did not fully understand the Trade Records and Monthly Statements sent to him and did not believe that they were accurate.  Siegel also credibly testified that he entered into the FMP in part without the intention of participating in futures trading and thought he was entering into a program that would limit his risk of loss by selling grain at a fair price.

Siegel's expert witness, Philip Malefyt ("Malefyt") showed that he had the sufficient background, experience, and training to testify and make expert conclusions

concerning certain issues before this court, including guaranteed minimum price contracts, hedge to arrive contracts, purchase to arrive contracts, and premium bid contracts. (Tr. 378-80, 390). Although at times Malefyt had to be admonished by the Court and instructed to limit his answers to the questions asked, Malefyt credibly testified and supported his conclusions that Ty-Walk did not follow reliable accounting practices and that its records were not accurate or reliable. For example, Malefyt pointed out that one entry on a Ty-Walk record was listed as a net gain when it should have been listed as a net loss. (Tr. 401). We point out that to the extent that Malefyt has offered certain legal conclusions or testimony relating to topics that he did not have expertise in, we have disregarded such testimony.

In general, Wells' witnesses appeared credible. However, their testimony was of limited relevance due to their lack of personal knowledge on key issues and their testimony was merely tied to general assertions in regards to Ty-Walk's business practices and the documentary evidence presented by Wells. For example, two representatives of Ty-Walk who testified on behalf of Wells indicated that they did not have any personal knowledge relating to certain business practices at Ty-Walk, which were controlled by Gibbons.

## CONCLUSIONS OF LAW

1.  This court has diversity subject matter jurisdiction since Wells is a citizen of California and South Dakota and Siegel is a citizen of Illinois and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

2. In order to prevail on a breach of contract claim in a civil case, a plaintiff must prove the elements for the claim by a preponderance of the evidence.

3. The breach of contract claims in Count I and III are governed by Illinois law.

4. Under Illinois law, for a breach of contract claim, a plaintiff must establish: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999)(stating that "[a] defendant's failure to comply with a duty imposed by the contract gives rise to the breach").

5. To establish the formation of a valid and enforceable contract under Illinois law, a plaintiff must establish that there was an "offer, acceptance and existence of valuable consideration." *Id.* In addition, a plaintiff must establish that there was "a meeting of the minds or mutual assent as to the terms of the contract," and "[t]he essential terms of a contract must be definite and certain in order for a contract to be enforceable. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987)(stating that "it is not necessary that the parties share the same subjective understanding as to the terms of the contract," that "'[i]t suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract,'" and that "a contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to

19

do'")(quoting in part *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977) and *Morey v. Hoffman*, 145 N.E.2d 644, 645-46 (Ill. 1957)); *see also Penzell v. Taylor*, 579 N.E.2d 956, 961 (Ill. App. Ct. 1991) (stating that "[w]hen the material terms and conditions are not ascertainable no enforceable contract is created").

6.  A contract can be formed under Illinois law expressly, orally, in writing, or can be implied. *Owen Wagener & Co. v. U.S. Bank*, 697 N.E.2d 902, 907 (Ill. App. Ct. 1998).

7.  A contract implied in fact is viewed in the same manner under Illinois law as "'an actual contract; the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, either written or oral, while in the latter their agreement is arrived at by a consideration of their acts and conduct'" *Owen Wagener & Co.*, 697 N.E.2d at 907 (quoting *Barry Mogul & Assocs., Inc. v. Terrestris Dev. Co.*, 643 N.E.2d 245 (1994)).

## I. Breach of Contract Claim Related to FMP (Count I)

8.  Wells has shown by a preponderance of the evidence that there was an offer, acceptance, and consideration in regards to an oral agreement between Ty-Walk and Siegel. The evidence shows that under the terms of the agreement, Ty-Walk would allow Siegel to participate in the FMP and Ty-Walk would help Siegel to get a fair price, whether it be a spot price or future price, for his

cash grain and in exchange Siegel promised to pay Ty-Walk a service fee of a penny or two per bushel.

9.    Wells has not shown by a preponderance of the evidence that there was a written or oral agreement formed between Siegel and Ty-Walk that authorized Ty-Walk to trade futures or options on Siegel's behalf. Neither is there sufficient evidence to conclude that there was an implied contract between Ty-Walk and Siegel to that effect.

10.   Wells introduced witnesses at trial, but the witnesses lacked personal knowledge of relevant facts in this case. Although Wells bases its claim on Count I on an alleged oral contract, its witnesses lacked personal knowledge concerning Siegel's oral representations. For instance, although Wells bases McDonald testified about the general data entry and record keeping procedures, she was unable to testify as to any specific recollection regarding Siegel's account. (Tr. 101-103). McDonald testified that she has never spoken to Siegel and that she was not a contact for Siegel's account. (Tr. 103). St. Germaine, another witness of Wells, was shown some trade records on the witness stand that pertained to 2000 and 2001, and St. Germaine acknowledged that the records were created in 2000 when she was not assigned to the FMP and in 2001 after her employment ended at Ty-Walk. (Tr. 127, 129). St. Germaine could not confirm whether she had been personally involved in mailing out the Monthly Statements for Siegel's account. (Tr. 127-28). St. Germaine also testified that she was never contacted personally by Siegel, that she was never assigned to

21

Siegel's account, and that she did not have personal knowledge regarding Siegel's account. (Tr. 131).

11. Wells introduced evidence at trial such as the Trade Records sent to Siegel that Wells contends establishes that Siegel was aware that Ty-Walk was engaging in futures trading on his behalf. However, based upon Siegel's own testimony and other evidence, such as the handwritten notations and questions by Siegel on the signed Trade Records that were returned to Ty-Walk, it is clear that Siegel did not fully understand them. Although Siegel acknowledged that he generally signed the copies of the Trade Records and mailed them back to Ty-Walk, Siegel testified credibly that he merely did so because that was what he was instructed to do by Ty-Walk, not because he intended to memorialize a pre-existing contract. (Tr. 191-94). Siegel wrote questions on some of the Trade Records he signed indicating that he did not understand certain entries, which he believed were inaccurate. (Tr. 195). Siegel also, for example, placed question marks on other statements and Trade Records, indicating that although he signed them as Ty-Walk requested, he did not understand them. (Tr. 201). The evidence also showed that no one at Ty-Walk bothered to respond to Siegel's questions to explain his account situation. Siegel was thus left in the dark as to what was occurring with his account. All someone at Ty-Walk needed to do in response to Siegel's handwritten questions was to pick up the phone or write a letter to Siegel and explain that Gibbons was trading futures on Siegel's account and explain the meaning of the figures on Siegel's

statements that Siegel did not understand. Had someone at Ty-Walk done so, it might have led to an understanding or clarification if in fact there was an agreement between Ty-Walk and Siegel as Wells contends. However, the evidence clearly shows that Ty-Walk was not run in such a business-like manner. It was run by Gibbons in an informal manner. Siegel made it clear during his testimony that Gibbons had formed a close working relationship with Siegel and had convinced Siegel to join the FMP. Thus, it was natural and reasonable for Siegel to place some trust in Ty-Walk, based upon his relationship with Gibbons, and for Siegel not to raise alarm at the first unexplained notation on the Trade Records that he returned to Ty-Walk. Thus, Siegel properly wrote his questions on the Trade Records. Siegel could not reasonably have been expected to make further inquiries and had no solid grounds to suspect Gibbons' dealings with his account. Since Siegel had thus far worked with Gibbons mainly based upon verbal discussions between Siegel and Gibbons, Siegel did not have reason to be overly concerned by the confusing and inaccurate entries on the Trade Records sent to him.

The triplicate record process utilized by Ty-Walk with its Trade Records apparently seeks to mimic a contract formation by requiring the customer to sign the Trade Records and return them to Ty-Walk. Some of the Wells' witnesses also referred to the Trade Records as contracts. However, the Trade Records could not have been a part of the formulation of any contract with Siegel. The records were formed after the performance of the alleged

trade and there was also sometimes a "lag[]" time in the preparation of the Trade Records before they were mailed to a customer. (Tr. 58, 60, 76, 81-82, 118). Thus, the records were created after the point when there would necessarily have to have been an offer and acceptance and at least partial performance on the contract. (Tr. 58, 60, 76, 81-82, 118). If the bargained for exchange that formed the crux of the contract was that Ty-Walk would trade certain grain for Siegel and Siegel would compensate Ty-Walk, then the parties could not have entered into a contract after Ty-Walk already had traded the grain. At most, the Trade Records could be deemed to be some sort of memorialization of a prior formed contract. However, in the case of Siegel, the terms of a prior contract, if any, were unclear. In addition, Siegel did not fully understand or agree with the accuracy of the Trade Records he received, and the evidence shows that Siegel had no intent to memorialize a pre-existing contract, since one did not exist.

12. The evidence shows that Siegel was misled by Gibbons, who was attempting to conceal his own unauthorized actions, with false assurances. For example, Siegel agreed as to the accuracy of Audit #3, even though he had initially challenged it as inaccurate, after he received oral assurances from Gibbons over the phone. Even then, Siegel noted in his concurrence with the accuracy of Audit #3 that he was doing so "Per Phone Call with Buzz 9/28/00 and its clarifications. PS." (D Trial Exhibit SX-3, p. CG000501 and Tr. 503). Gibbons remained a central figure that Siegel contacted concerning Siegel's

dealings with Ty-Walk. (Tr. 228-29, 499). Although Wells argues that there was an underlying agreement authored between Siegel and Gibbons dealing with futures and options trading, only Siegel presented testimony at trial concerning the discussions between Siegel and Gibbons. No testimony was presented by Gibbons in person or in any other manner such as by a recorded deposition.

Wells attempts to stand in Ty-Walk's shoes and assert Ty-Walk's contractual rights, but Gibbons, Ty-Walk's own representative in the alleged contractual formation, provided no testimonial evidence at trial. There was no evidence, for example, concerning what Gibbons heard Siegel say or agreed to at the time of the alleged contract formation. The documentary evidence presented by Wells at trial was incomplete, inconsistent, and insufficient to carry the day for Wells to show that Siegel agreed to enter into a contract with Ty-Walk that included the terms now asserted by Wells.

To conclude that Siegel had entered into such a contract with the terms now urged by Wells would require the court to make broad and unreasonable inferences and engage in speculation. It is Wells' burden to establish its case and that burden is not reduced just because Wells believed that individuals, such as Gibbons, would not assist Wells in the prosecution of its claims. Siegel cannot be held accountable for some undefined and amorphous agreement that Wells in retrospect contends existed. Nor can Siegel be held accountable for the fact that Gibbons operated Ty-Walk in an informal manner without proper

accounting methods and engaged in business with his clients' grains based upon a handshake, phone call, or other informal communication rather than putting agreements in writing, which made it more difficult for Wells to prove its case. If, as Wells contends, Siegel did enter into an oral contract that envisioned the trading of futures and options, there would necessarily have been a list of terms to address the pertinent contractual issues. However, Wells has not presented any testimony that details the essential terms of such an agreement or presented any memorialization of the agreement or other evidence of the parties' conduct that would allow the court to reasonably infer the essential terms of the contract. The problems associated with Wells' incomplete and inconsistent documentary evidence are also compounded by the fact that Siegel has established through his expert's testimony and other evidence, that Ty-Walk's records are inaccurate and unreliable. The evidence showed, for example, that Gibbons had virtually a free reign to make trades with customers' grain and the customer contact and person that entered some of the documentation for trades generally had no idea whether the trade being documented was authorized by the customer. (Tr. 45, 48, 103).

Wells apparently recognized the potential flaws and inaccuracies in the Ty-Walk records and Wells tries to make up for the deficiencies with broad-based arguments such as that the "sheer number of contracts" signed by Siegel show that he is liable. (W. FL. Par. 27). However, Wells cannot prove its case simply by presenting a pile of documents, particularly when, as in this case, the

circumstances surrounding the documents and the information in the documents raises serious questions and concerns about their accuracy. Wells must show how the documents establish its case, and Wells has not done so in this instance. Wells' documentary evidence raises more questions than answers and proves little other than that Siegel is correct in his contentions that Gibbons ran Ty-Walk with unprofessional and unreliable business practices. The crux of Wells' case is to point to Ty-Walk's records and present witnesses without personal knowledge to explain how the Ty-Walk business operated in general and to argue that there is no plausible explanation for the information on the documents other than that Siegel is liable. There was ample evidence presented at trial, however, that calls into question the accuracy of the documents. There was also evidence presented that showed gaps in the documentary evidence and evidence concerning circumstances that showed that Siegel is not liable at all. It is Wells' burden to prove its case by a preponderance of the evidence and Wells' pile of documents falls far short of establishing liability on the part of Siegel.

Wells also argues that Siegel was "a knowledgeable and attentive trader." (W. FL. Par. 27). However, Wells fails to explain why a "knowledgeable and attentive trader" would take actions such as writing a question mark on the Trade Records when he did not understand something and still sign and return the document to Ty-Walk because Ty-Walk had told him to do so. In addition, this court heard extensive testimony from Siegel and,

based upon his demeanor on the stand and manner of his responses, it is clear that he did not fully comprehend the Trade Records sent to him and, in particular, the Trade Records at issue in this trial. Siegel was entirely credible in his assertions that he signed the documents only because that is what Ty-Walk instructed him to do and his assertions that he was unwittingly made a victim by Ty-Walk's and Gibbons' underhanded dealings. It was abundantly clear that all Siegel, as a farmer, wanted to do was sell his grain through Ty-Walk at a fair price. There is insufficient evidence in the record upon which to reasonably infer that a contract existed, express or implied, in the terms asserted by Wells in Count I. Therefore, we find in favor of Siegel on Count I.

Even if there was a contract, the evidence shows that Siegel only agreed to provide grain to Ty-Walk and Ty-Walk agreed to sell Siegel's grain at a fair price. The evidence further shows that Ty-Walk utilized and engaged in irregular trading practices and maintained inaccurate accounting records, which were questioned and challenged by Siegel. There is no evidence that Siegel breached any contract with Ty-Walk by refusing to provide grain to Ty-Walk for sale. There is no evidence that such a contract was not fulfilled by Siegel. To the contrary, the evidence presented shows that Ty-Walk may have breached its contract with Siegel by engaging in improper trading practices and keeping and billing inaccurate business records. In addition, Wells has failed to establish by a preponderance of the evidence that Siegel owed any money to Ty-Walk. The documents and statements created by Ty-Walk are not credible

or reliable. Siegel's expert witness, Malefyt, indicated that Ty-Walk's accounting methods were not methods that were "customary within the industry" and he referred to Ty-Walk's practices as a "ponzi" scheme. (Tr. 401). The accuracy of Ty-Walk's Trade Records and Monthly Statements as to the Siegel account were challenged by Siegel. Ty-Walk's Trade Records and Monthly Statements contain duplicative and rollover information that only Ty-Walk would understand and no evidence was presented by a Ty-Walk representative relating to the meaning or the accuracy of those entries as to the Siegel account. The only testimony by Ty-Walk representatives relating to the financial statements on Siegel's account, or for that matter on any account, was that they were told by Gibbons to make such entries. As we indicated earlier, Wells did not present the testimony of Gibbons. The accounting statements of Ty-Walk are confusing and do not establish with any clarity that the amounts identified by Ty-Walk are actually owed by Siegel. As an aside, it is not clearly evident why Ty-Walk was engaged in such business practices, and one wonders if Ty-Walk was exploiting its relationship with farmers, such as Siegel, in order to enhance its own trading position with certain traders and using the farmers' potential crop as leverage in the market and we have not considered such factors in reaching our decision. However, one thing that is clear is that Ty-Walk's financial records were not accurate or reliable as they related to Siegel. As we stated above, even if there was any contract between Siegel and Ty-Walk, Wells did not meet its burden of proof relating to any

amount that Siegel owed to Ty-Walk on Count I. Therefore, we find in favor of Siegel on Count I.

## II. Breach of Contract Claim Related to the 2000 CCC Loan (Count III)

13. Wells has not established by a preponderance of the evidence that Siegel owes any additional funds to Ty-Walk as part of the 2000 CCC Loan.

14. The contract for the 2000 CCC Loan was between CCC and Siegel. No evidence was produced to show that there was any separate written contract between Siegel and Ty-Walk relating to the 2000 CCC Loan. However, since the 2000 CCC Loan was based on a warehouse receipt, by CCC's regulation, the warehousing company, in this case Ty-Walk, was obligated to either pay off the 2000 CCC Loan or to accept the county-posted price.

15. Ty-Walk had full knowledge of the underlying facts and circumstances of the 2000 CCC Loan.

16. There is no evidence in the record that when Ty-Walk made the payment on the 2000 CCC Loan that they were coerced into doing so, that the payment was made as a result of fraud or a superior bargaining position by Siegel, or that the money was paid under a mistake of law or fact.

17. Since the uncontested evidence shows that the value of Siegel's grain warehoused at Ty-Walk as collateral at the time Ty-Walk paid off the 2000 CCC Loan and remaining at Ty-Walk when the company was closed on August 23, 2001, was greater than the payment made by Ty-Walk to extinguish the

2000 CCC Loan, Ty-Walk's claim against Siegel is set off. In any event, Ty-Walk was responsible to pay the 2000 CCC Loan in one form or another, and the payment method Ty-Walk chose, which was the county-posted price, resulted in Ty-Walk paying considerably less money than the value of the grain that Siegel deposited with Ty-Walk. We further note that had Ty-Walk not paid off the loan at the daily county-posted price, which was considerably less than the value of the collateral stored by Siegel at Ty-Walk, Siegel would not have had to pay off the 2000 CCC Loan because either Ty-Walk would have had to pay off the 2000 CCC Loan or CCC would have taken possession of the collateral from Ty-Walk, which would have been deemed as full payment of the 2000 CCC Loan under the CCC regulations.

18. The only evidence presented by Wells is that Ty-Walk paid $50,785.16 to the CCC to pay off the 2000 CCC Loan. The evidence produced by Siegel reflects that Siegel deposited grain at Ty-Walk's warehouse worth more than the 2000 CCC Loan; that Siegel's grain that was deposited at Ty-Walk's warehouse was the collateral used for the 2000 CCC Loan; that CCC accepted as full payment for the 2000 CCC Loan the daily county-posted price as established by CCC; and that the payoff amount by Ty-Walk for the 2000 CCC Loan was considerably less than the value of the collateral provided by Siegel to Ty-Walk.

19. Therefore, we find in favor of Siegel on Count III and conclude that there was no breach of contract by Siegel and that Siegel does not owe any funds to Ty-

Walk in regards to the 2000 CCC Loan.

## CONCLUSION

Based on the foregoing analysis, we find in favor of Siegel on Wells' breach of contract claim based upon participation in the FMP (Count I), and we find in favor of Siegel on Wells' breach of contract claim based upon the 2000 CCC Loan (Count III). We hereby direct the Clerk to enter judgment of the Court in favor of Siegel on Count I and Count III.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated:   June 8, 2007